UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TAMMY L. COFFEY, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | 1:06-cv-1360-LJM-TAB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|     Defendant. ) | |

### ENTRY ON JUDICIAL REVIEW

Plaintiff, Tammy L. Coffey ("Coffey"), requests judicial review of the final decision of defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), denying Coffey's application for Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). The Court rules as follows.

### I. BACKGROUND

### A. PROCEDURAL HISTORY

Coffey was born on September 3, 1970. R. at 52. Coffey was thirty-five years old at the time of the Administrative Law Judge's, Mason D. Harrell, Jr. ("the ALJ"), decision. *Id.* Coffey has a tenth grade education and has worked as a secretary/clerk. *Id.*

Coffey applied for SSI on March 7, 2003, alleging that she became unable to work due to severe claustrophobia, severe depression, and severe panic attacks on November 1, 2001. R. at 84-85, 95. The Social Security Administration denied Coffey's applications initially and upon reconsideration. R. at 63-66, 69-70. Coffey requested a hearing. R. at 72. The ALJ held two

hearings at which Coffey was represented by counsel. R. at 288-368. The ALJ found that Coffey was not disabled within the meaning of the SSA for any time period relevant to the decision. R. at 58A. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review. R. at 4-6.

## B. MEDICAL HISTORY

Coffey began treatment for major depression and generalized anxiety on November 29, 2001. R. at 223. On that date, Coffey visited Behavioral Care Services and reported bereavement, disturbed sleep, and paranoia. *Id.* Coffey also suffered panic attacks. R. at 95. Dr. Rebecca Moredock ("Dr. Moredock") began treating Coffey with Zoloft and Zyprexa. R. at 199. Coffey also began attending individual and group therapy at Gallahue Mental Health Services ("Gallahue") in April 2002. R. at 218, 222.

On April 15, 2002, Coffey told Dr. Moredock that she had only experienced one or two panic attacks since February 2002, that she was sleeping better but still having weird dreams, and that she was still feeling anxious. R. at 199. At that time, Dr. Moredock noted that Coffey was "doing better" and that her depression was well controlled. *Id.*

Dr. Moredock found continued improvement in subsequent examinations in May 2002, noting that Coffey's crying spells, agoraphobia, and panic attacks had all improved, but she also noted that Coffey appeared anxious and said she still "worrie[d] about everything." R. at 197-98. Dr. Moredock increased Coffey's dosage of Zyprexa. R. at 197.

Dr. Moredock noted continued improvement at subsequent examinations in July and September 2002. R. at 195-96. Coffey reported that her panic attacks were improving, and that she

only experienced two or three a month. *Id.* Dr. Moredock continued the same treatment of Zoloft, Zyprexa, and therapy. *Id.*

Coffey attended group and individual therapy sessions beginning in April 2002. R. at 209-22. Coffey was described as "attentive," "insightful," "non-verbal," and an "inactive participant" at the first group session on April 15, 2002. R. at 222. Coffey was described as "verbal" and an "active participant" at subsequent sessions. R. at 211, 217, 219-21.

In a June 2002 individual therapy session, Coffey reported having panic attacks in the car. R. at 215. Individual and group therapy notes documented that Coffey was having trouble completing her worksheets. R. at 212-15.

Following her father's death in October 2002, Coffey began suffering from bereavement and crying spells. R. at 194. In November 2002, Coffey continued suffering from bereavement and crying spells related to her father's death, but her panic attacks were well controlled. *Id.* Dr. Moredock continued the same treatment of Zoloft, Zyprexa, and therapy through September 2003. R. at 190, 193-94.

In January 2003, Coffey requested a letter stating that she was unable to work due to her panic attacks. R. at 206. Dr. Ola Smith, the Primary Therapist at the Gallahue, wrote that she would write the letter because Coffey's continued anxiety and agoraphobic tendencies would make work difficult. R. at 205.

Other than noting that Coffey shared the death of her father in a group therapy session, Coffey's group therapy notes show no major changes between October 2002 and August 2003. R. at 191, 200-04, 207-08. Coffey was encouraged to journal following her father's death. R. at 208.

On May 21, 2003, Coffey was examined by Dr. Russ Rasmussen ("Dr. Rasmussen") at the

request of the Social Security Administration. R. at 153-55. Coffey reported that she was in good health, and that her anxiety was exceptionally low that day. R. at 153. However, Coffey also said that she would not have been able to attend the examination if she had not spent days studying weather maps and forecasts for the area to prepare for the trip. *Id.* Coffey stated that her panic was "not wanting to go places," that she could not be in small places, and that she "gets nervous, sweats and experiences shortness of breath." *Id.* Dr. Rasmussen noted that Coffey was cooperative and alert during the interview, that she answered questions readily, and that her memory and concentration appeared intact. R. at 154. Dr. Rasmussen also noted that her mood was composed and that her affect was appropriate. *Id.* Dr. Rasmussen concluded that Coffey's mental capacity was moderately impaired, but noted that this was based more on history than what he saw in the interview. R. at 155. Dr. Rasmussen assessed Coffey's Global Assessment of Functioning ("GAF") at forty-five.[1] *Id.*

In July 2003, a state agency psychologist reviewed Coffey's medical records. R. at 158-75. The report found that Coffey had moderate limitations in the ability to understand, remember, and carry out detailed instructions, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, and respond appropriately to

---

[1] A "GAF", or "Global Assessment of Functioning" is a measure of the physician's judgment of the individual's overall level of functioning. The GAF assessment includes psychological, social, and occupational functioning, but does not include impairment in functioning due to physical or environmental limitations. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32-33 (4th ed. 2000). A GAF between forty-one and fifty is described as "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

changes in the work setting. R. at 158-59. The report found no other limitations in her ability to perform basic work-related activities. *Id.*

Dr. Moredock found continued improvement in September 2003. R. at 190. Dr. Moredock noted that Coffey suffered little anxiety, mild depression, and had bright affect. *Id.* However, Coffey still reported sad mood due to her father's death and low energy. *Id.* Dr. Moredock discontinued Coffey's prescription for Zoloft and prescribed Vistaril and Lexapro, while continuing treatment with Zyprexa and therapy. *Id.*

In October 2003, Dr. Moredock noted that Coffey had not been attending therapy because she could not afford her co-pay. R. at 178. Also in October 2003, Dr. Moredock reported to the Social Security Administration that Coffey had trouble leaving her home due to her anxiety and that it was unclear whether her treatment would affect this to a level where she could work. R. at 182. Dr. Moredock noted that Coffey had improved to the point that she had been able to leave the house at least one time per week, but that she was not to the point where she was able to leave regularly, even to attend appointments or provide for her own needs. *Id.*

Dr. Moredock again found improvement during a December 2003 examination. R. at 189. Dr. Moredock noted that Coffey's mood was good, that her anxiety was "pretty well controlled," but also that her energy was low. *Id.* Dr. Moredock continued the same treatment and encouraged Coffey to exercise to improve her energy. *Id.*

On March 10, 2004, Coffey was examined by Dr. Alfred R. Barrow ("Dr. Barrow") at the request of the Social Security Administration. R. at 224-29. Coffey stated that she was applying for SSI because she had depression, severe panic attacks, and had trouble leaving the house. R. at 225. Coffey rated her level of depression at a seven out of ten and her anxiety at an eight or

5

nine out of ten. *Id.* Coffey reported that she had been attending group therapy sessions, but stopped because she could no longer afford it. *Id.* Dr. Barrow found that Coffey reported some depressive symptomology, but concluded that she did not meet the full criteria for a major depressive disorder. R. at 229. Coffey reported a subjectively high level of depression, that she had some difficulty with sleep, no impairment of appetite, and described what appeared to be "panic attacks with some agoraphobic tendency given her tendency to isolate and to have difficulty going out in public without her mother." *Id.* Coffey stated that the panic attacks had improved and become less frequent, and that medication appeared to be controlling them to some degree. *Id.* Dr. Barrow found that her "[c]oncentration appear[ed] to be moderately affected, while computational ability, general memory functioning, comprehension and formal judgement appear[ed] to be relatively intact. *Id.* Dr. Barrow diagnosed Coffey with "Depressive Disorder Not Otherwise Specified" and "Panic Disorder with Agoraphobia" and assessed her current GAF at fifty-nine. *Id.*

Coffey discontinued treatment with Dr. Moredock on May 12, 2004, due to financial difficulties. R. at 239

On July 7, 2004, Coffey visited the Blue River Medical Group complaining of chest pains, trouble breathing, and back and shoulder pain that had lasted one week. R. at 241. Coffey also reported suffering from a "nervous stomach" and frequent heartburn. *Id.* There is no record of further treatment relating to this visit.

On October 9, 2004, Coffey visited the emergency room at Major Hospital complaining that she became very weak, dizzy, and cold after donating blood at a blood drive. R. at 265. Coffey underwent some tests and was discharged that day. R. at 265-71. There is no record of further treatment relating to this visit.

On September 14, 2005, Coffey was scheduled to undergo a new intake evaluation at Gallahue, but called the day before to reschedule because it was supposed to storm and she was afraid. R. at 278. Coffey underwent the intake evaluation on September 22, 2005. R. at 273. Coffey reported difficulty functioning with others due to decreased mood, paranoia, panic and anxiety, and social isolation. *Id.* Coffey cried during her examination and said that her dog was sick and her mother was in a nursing home. R. at 275. Coffey reported having panic attacks four to five times a day. *Id.* Coffey was found to be a low risk to herself or others. R. at 277. Coffey's GAF was assessed at forty. R. at 274.

Coffey returned to group therapy on September 26, 2005. R. at 279. During her first session, Coffey was described as having a sad and anxious mood, limited concentration, limited judgment/impulse control, limited insight, low to moderate and appropriate participation, and a cooperative and guarded attitude. *Id.* Coffey continued to attend weekly group therapy sessions until October 24, 2005. R. at 283-85. Coffey was typically noted to be anxious or calm at these sessions, and exhibited appropriate thought content, a cooperative attitude, and logical, goal-oriented thought processes. *Id.* Coffey attended an individual therapy session on November 7, 2005, at which she reported increased depression since her dog died. R. at 286. Coffey was described as having a sad attitude, limited concentration, limited insight, limited judgment, a cooperative attitude, and moderate and appropriate participation. *Id.* There are no further treatment records.

### C. ALJ HEARING

At hearings held on July 19, 2005, and November 28, 2005, Coffey testified that she had not worked for four or five years and that she had to quit her last job in a grocery store because she

needed to stay home to help take care of her father.[2] Coffey stated that she had not applied for any other jobs since then because she has severe panic attacks, and she cannot work during the summer because she is afraid of thunderstorms. R. at 328. Coffey stated that her mother is her only source of income, that she did not graduate from high school, that the highest level of education she completed was the tenth grade, and that she was taking an online GED class. R. at 328-29. Coffey testified that she did not use drugs or alcohol. R. at 293. Coffey testified that she had been in treatment for depression and anxiety for two-and-a-half years, but that she still suffered panic attacks two or three times a day and did not think that her condition had improved. R. at 295. Coffey stated that she had trouble leaving the house by herself and that she stayed in her room most of the day. R. at 296. Coffey stated that her hobbies are crafts and playing or chatting on the computer. R. at 303, 309. Coffey testified that she thought that if she had a full-time job, she would only be able to work one or two days a week because of her anxiety, and she would often have to go home early. R. at 304-05. Coffey also stated that she sometimes had crying spells that lasted as long as three or four hours. R. at 305.

Coffey's mother, Bonita Coffey ("Bonita") also testified at the supplemental hearing. R. at 310-21. Bonita testified that Coffey currently lived with her, and that Coffey was too dependent to live on her own. R. at 311. Bonita testified that whenever Coffey goes to the store, she has to go with her, and that sometimes Coffey has panic attacks that forced them to leave before they are done shopping. R. at 311-12. Bonita also testified that Coffey sometimes helps with cooking and laundry,

---

[2]Coffey testified at the initial hearing on July 19, 2005, and at the supplemental hearing on November 28, 2005. R. at 289, 324. At the initial hearing, Coffey testified that she quit her job at the grocery store to help take care of her father. R. at 327. However, at the supplemental hearing, Coffey testified that she quit her job at the grocery store because she was having bad panic attacks and she had a fear of thunderstorms. R. at 292.

but that Coffey often leaves the clothes in the washer.  R. at 314-25.  Bonita stated that Coffey is sometimes afraid to come out of her room to take a shower, and that she will sometimes go several days without taking one.  R. at 315.  Bonita testified that when she leaves the house, Coffey would get worried and start calling people if she was even five minutes late getting home.  R. at 316.  Finally, Bonita testified that it was difficult for Coffey to come to the hearing that day because she was afraid it might storm.  R. at 318-19.

A medical expert, Dr. Malancharuvil (the "ME"), testified at the initial hearing.  R. at 337-60.  The ME testified that Coffey had suffered a major depressive episode that lasted for five or six months, which would fall under Listing 12.04, and that she had a generalized anxiety disorder with some symptoms of agoraphobia, which would fall under Listing 12.06, but that there was no evidence that she sustained a condition that lasted for more than six months.  R. at 338.  The ME opined that Coffey would be limited to moderately complex tasks in a relatively habituated setting, with no public contact, and that she should refrain from safety operations and not operate hazardous machinery.  *Id.*  The ME opined that, based on his reading of the medical evidence, Coffey has a good prognosis if she stayed in sustained treatment.  R. at 340.  The ME stated that Coffey had significant symptoms in the early stages of her illness, which prevented her from functioning in a work setting, but that she had shown improvement since then.  R. at 340-41.  The ME opined that if Coffey worked now, she would still have anxious feelings that might disrupt her work for a few minutes at a time, but that such episodes would not last for a significant time.  R. at 341.

The ME testified that Zyprexa is usually prescribed for psychotic disorders, but that Coffey did not have a psychotic diagnosis.  R. at 345-46.  The ME stated that Zyprexa is also sometimes prescribed at low levels for anxiety.  R. at 346.  The ME testified that Coffey was prescribed a

"significant dosage," but that did not necessarily mean that Coffey was severely mentally ill. *Id.* The ME testified that a GAF of forty-five means that the person has significant problems functioning at the time. R. at 349. The ME stated that a GAF is based mostly on subjective reporting by the patient. R. at 358. The ME opined that because the GAF was a subjective measure, Dr. Rasmussen's finding of a GAF of forty-five is not inconsistent with the conclusion that Coffey's mental functioning was intact. R. at 354-55. The ME stated that he doubted that a GAF is used for treatment decisions, but that it can be used to measure progress. R. at 359.

A vocational expert, Stephanie Archer (the "VE"), also testified at the initial hearing. R. at 362-367. The VE testified that Coffey's prior relevant work as a secretary/tech support was sedentary and semi-skilled. R. at 362. The VE opined that a thirty-four-year-old with a tenth grade education who cannot be around any people she does not know due to severe agoraphobia would not be able to work any job. *Id.* The VE opined that a thirty-four-year-old with a tenth grade education who had panic attacks at unpredictable times, which would prevent her from working for five minutes at a time, up to ten times a day, would not be able to work any job. R. at 363-64. The VE opined that someone of Coffey's age and education level, with no transferrable skills, with a residual functional capacity ("RFC") to perform no greater than moderately complex tasks of up to four to five steps of instructions, in a relatively habituated setting with no public contact, but who could work in an office setting and in small groups of five people or so as long as there were not a lot of strangers involved, who could not be in charge or safety operations or work with hazardous machinery, and who could expect to have anxiety feelings that might distract her for a few seconds at a time, could not perform Coffey's past work as a clerk. R. at 364. The VE testified that this hypothetical person could perform the work of an assembler, of which there were 18,000 jobs in

Indiana; a machine tender, of which there were 6,400 jobs in Indiana; or inspector, of which there were 4,200 jobs in Indiana. R. at 365. The VE opined that a person of Coffey's age, education, and work experience, who is not able to work when there are thunderstorms and cannot leave her house by herself except at night would not be able to find any work. R. at 366.

## II.  DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI, a claimant must have a disability under 42 U.S.C. § 1382. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382a(a)(3)(A).

In determining whether a claimant is disabled, the ALJ applies the five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.  If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.  If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.  If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.  If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled

The burden of proof is on the claimant for the first four steps, then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The SSA, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g., Henderson v. Apfel*, 179 F.3D 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 635, 643 (7th Cir. 1987). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III. DISCUSSION

#### A. THE ALJ'S FINDINGS

At the first step, the ALJ found that Coffey had not engaged in substantial gainful activity since November 29, 2001. R. at 58. At the second step, the ALJ found that Coffey had severe impairments, "including history of major depressive episode and generalized anxiety disorder with agoraphobia." *Id.* At the third step, the ALJ found that Coffey did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ found that Coffey was a partially credible witness and had the following RFC:

> [Coffey] has the residual functional capacity to perform up to moderately complex tasks (up to [four] or [five] steps of instructions) in a relatively habituated setting (not requiring problem-solving or the ability to come up with a solution on a regular basis), routine work with no greater than occasional changes in the type of work, no public contact, no people-oriented work which requires dealing with strangers, with the ability to work in small groups of up to [five] people, requiring no operations or hazardous machinery. There are no exertional limitations.

*Id.* The ALJ found that Coffey was unable to perform her past relevant work. *Id.* At the fifth step, the ALJ found that Coffey was functionally capable of performing a number of jobs, including assembler (18,000 jobs in Indiana), machine tender (6,400 jobs in Indiana), and inspector (4,200 jobs in Indiana). R. at 56, 58A.

#### B. COFFEY'S ARGUMENTS ON APPEAL

Coffey alleges that the ALJ erred in finding that she was not disabled on the following grounds: (1) The ALJ failed to address evidence that supported a finding of disability; (2) the ALJ

13

failed to consider all of the relevant factors in making his credibility determination; (3) the ALJ failed to mention the relevant listing conditions by name; (4) the ALJ failed to give controlling weight to her treating physician's opinion that Coffey was disabled; (5) the ALJ failed to include in his hypothetical question to the VE any consideration of her inability to leave her room or to leave her house without her mother; and (6) the ALJ incorrectly relied on the Medical-Vocational Rules (the "grids"), even though Coffey had no exertional limitations.

Coffey alleges that the ALJ failed to address evidence that would have supported a finding that she met or equaled Listings 12.04 or 12.06. Although the ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson,* 999 F.2d at 643, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron,* 19 F.3d at 333. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307.

Coffey first alleges that the ALJ erred in selectively considering Dr. Moredock's treatment notes, citing them only insofar as they demonstrated an improvement in Coffey's condition, while ignoring the contrary portions. The ALJ's consideration of the treatment notes was sufficient. Coffey essentially argues that the ALJ failed to mention that in each of these treatment notes, Dr. Moredock continued to diagnose Coffey with "panic disorder w/agoraphobia; major depression single episode" and continued to prescribe medication for these conditions. R. at 189-90, 193-99. The ALJ stated that these treatment notes documented significant improvement with treatment. R. at 57. A conclusion that a patient's condition is improving with treatment is not contradicted by the

fact that the patient is being treated. The ALJ's finding that Dr. Moredock's treatment notes demonstrate an improvement in Coffey's condition is supported by substantial evidence.

Coffey also alleges that the ALJ completely failed to address other evidence that contradicted the ALJ's finding. Specifically, the ALJ did not mention or discuss at all any of the evidence relating to Coffey's treatment in September and October of 2005. This omission is more problematic. These records suggest that Coffey's condition had regressed since she discontinued treatment in May 2004. R. at 239, 273-87. During Coffey's intake evaluation on September 22, 2005, she reported having panic attacks four or five times a day and that she was depressed and feeling paranoid. R. at 275. Coffey cried during the interview because her dog was sick and her mother was in a nursing home. *Id.* Coffey was diagnosed with generalized anxiety disorder, major depression with psychotic features, and agoraphobia, and had a GAF of forty. R. at 274. Notes taken during Coffey's group and individual therapy sessions in October 2005 show that Coffey generally had an anxious, sad, or calm mood during these sessions, and that her concentration was usually limited but sometimes good, that her attitude was cooperative, cautious, or guarded. R. at 279, 282-86. This evidence seems to contradict the ALJ's finding that Coffey's symptoms improved significantly. R. at 57. Therefore, the evidence should have been considered by the ALJ. "[T]he ALJ [may not] select and discuss only that evidence that favors his ultimate conclusion." *Herron*, 19 F.3d at 333 (quoting *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1984)). Because the ALJ relied on the improvement noted in Dr. Moredock's treatment notes and the fact that Coffey's panic attacks seemed to be under control in his disability determination, the ALJ should have explained why evidence that Coffey's panic attacks were returning did not alter that determination.

15

The objective medical evidence regarding Coffey's condition in September and October 2005 is sparse. Coffey's intake form at Gallahue lists a diagnosis of generalized anxiety disorder, major depression with psychotic features, agoraphobia, and lists a GAF of forty. R. at 274. The therapy notes offer little to compare with previous observations. However, there is enough evidence to warrant consideration by the ALJ. This was the first time Coffey had been diagnosed with depression with psychotic features. This seemingly new development should have been considered the ALJ. It is not clear who made the diagnosis, so it is not clear whether that opinion is entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2) (stating that controlling weight is to be given to the opinion of a treating physician when that opinion is supported by medical evidence and is not inconsistent with other substantial evidence in the record). Nevertheless, the ALJ should have considered the diagnosis, and determined what weight to accord it. *See id*.

Additionally, Coffey's GAF of forty, when considered along with the ME's testimony, contradicts the conclusion that Coffey's condition was improving. The ME testified that a GAF is used to measure progress. R. at 359. A GAF of forty in September 2005 would therefore be evidence that Coffey's condition was regressing. Coffey's GAF was assessed at forty-five by Dr. Rasmussen in May 2003, then at fifty-nine by Dr. Barrow in March 2004. R. at 155, 229, 274. In light of the ME's testimony that a GAF is used to measure progress, and the fact that Coffey's GAF lowered, the ALJ should have discussed this evidence that was contradictory to his conclusion that Coffey's condition was improving.

It is possible that the ALJ might have concluded that the September 2005 examination was not evidence of regression. Since the ALJ stated that a GAF is based mostly on subjective reporting, and the ALJ found that Coffey was not wholly credible, the ALJ might have concluded that Coffey's

GAF was not an accurate reflection of her mental status. On the other hand, Coffey's hearing testimony was closer in time to the September 2005 examination, at which she reported having four or five panic attacks a day, than to her visits with Dr. Moredock, at which she reported having panic attacks less frequently. R. at 193, 199, 275, 295. Therefore, the ALJ might have found Coffey's testimony more credible if he had considered the September 2005 examination. While the ALJ might have had perfectly sound reasons for concluding that Coffey's condition was not regressing, "this conclusion is not so evident on the record in this case that [the Court] can reach it [alone] without further analysis by the ALJ." *See Look v. Heckler*, 775 F.2d 192, 196 (7th Cir. 1985).

Because it is not apparent whether or not the ALJ considered the evidence relating to Coffey's September and October 2005 treatment, this Court cannot evaluate and determine whether substantial evidence existed to support the ALJ's findings. *See Herron*, 19 F.3d at 337 ("When the ALJ fails to mention an entire line of evidence in his decision, we are unable to conduct a meaningful review because we cannot establish if substantial evidence supported the denial of benefits").

The ALJ's failure to consider the September 2005 examination also calls into question the ALJ's credibility determination. When reviewing an ALJ's credibility determination, the Court will not reweigh the evidence or decide questions of credibility anew. *See Nelson*, 131 F.3d at 1234. Nevertheless, the Court will reverse a credibility determination when the ALJ fails to give specific reasons for the finding that are supported by the record. *See Brindisi ex el. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

The ALJ cited three factors in support of his credibility determination: (1) Coffey's activities of daily living were inconsistent with disability; (2) Coffey testified at the hearing that she suffered

17

two or three panic attacks a day, while she reported to her physician no more than one or two in the two-month period between February of 2002 and April of 2002, and reported no longer having them in February of 2003; and (3) the fact that Coffey's mother testified that Coffey could go for days without taking a shower, while Coffey told a consultative examiner that she bathed every day. R. at 57. The September 2005 intake examination supports Coffey's hearing testimony that she was having frequent panic attacks, even if she had them less frequently in February and April of 2002. The ALJ did not explain why this evidence did not support a favorable credibility finding, nor did he explain why he found Coffey's report to Dr. Moredock that her panic attacks were improving in 2002 more credible.

As discussed above, the September 2005 examination provides some objective medical evidence that Coffey's condition was regressing. R. at 273-76. When there is some medical evidence supporting a plaintiff's allegations, the ALJ may not simply disregard that testimony. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). While the ALJ did cite other reasons for his credibility determination, it is not entirely clear if the ALJ would have reached the same determination had he not found that Coffey's hearing testimony was inconsistent with her statements to her physicians.

Coffey's testimony that she was suffering panic attacks more often in November 2005 is not necessarily inconsistent with telling her physician that she was suffering them less frequently in 2002 and 2003, especially if there is evidence that her condition was deteriorating in September and October 2005. R. at 273-87. Because this additional evidence might result in a more favorable determination, the ALJ should reconsider his credibility determination as well.

The Court finds no other cause for error in the ALJ's decision.

In summary, the ALJ's decision is not supported by substantial evidence. The ALJ's failure to consider Coffey's September and October 2005 treatment leaves the Court unable to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Diaz*, 55 F.3d at 308. In light of the ALJ's reliance on Dr. Moredock's treatment notes as evidence that Coffey's condition was improving, the ALJ's failure to consider evidence that Coffey's condition had perhaps regressed by September 2005 does not provide sufficient analysis of the evidence to allow this Court to "trace the path of his reasoning." *Diaz*, 55 F.3d at 307. For these reasons, the ALJ's decision must be **REMANDED** for further consideration

### IV. CONCLUSION

For the reasons stated herein, the cause is **REMANDED** for further proceedings consistent with this opinion. Judgment shall enter accordingly.

IT IS SO ORDERED this 18th day of March, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Patrick Harold Mulvany
mulvany@onet.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov